The next case is Joseph Egan v. Delaware River Port Authority. Mr. Solonson. This is still good morning, your honors. Mr. Clark, my name is Michael J. Solonson, and I represent Joe Egan, the appellant in this matter. I'd like to reserve two minutes of my ten minutes. Ms. Goldberg has the other five. We have two issues here, your honors. The jury instruction issue and the 403 evidentiary issue. If you decide in our favor on the jury instruction issue, that would require reversal of only the FMLA verdict. If you decide in our favor on the 403 issue, it requires a reversal of both the FMLA and the ADA issue. I want to actually pick up on Judge Schwartz's concerns in the last argument about congressional intent. And I will both hone my argument and hone in on that. Perfect, perfect. You're off to a great start. Playing to the judge, as they say. If you believe that this form of retaliation under the FMLA falls within A1, then it is very clear that Mr. Egan should have been entitled to a mixed mode of instruction as a matter of congressional intent. And the reason why we know that is because in A1, Congress did not adopt language that appears in other anti-discrimination statutes. It does not use the words because of or things of that like that appear in Title VII or the ADA. So are you acknowledging that if it's in A2, we could read that second for the way the RPA is encouraging us to? I will get there. I don't necessarily agree with that because I think that tortures the meaning of the word for. But if you stick to A1 and you conclude that it's an A1 claim, the language that they use comes from the National Labor Relations Act, and in particular 8A1 of the Act, which says it should be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by the Act. Almost identical language. That should be unlawful for any employer to interfere with, Well, you're suggesting to us that we should be looking at sort of the genealogy of language in different statutes, but timing matters. When things get amended matters. That was another subject from the last time. Wasn't the FMLA enacted after Title VII had been amended to include the motivating factor language? So why wouldn't, if we thought, well, Congress knows how to do that. They just did it. And they didn't do it in the FMLA. But that's meaningful. You've gone too far. You have to go to the point of enactment. What existed at the point of enactment, and what existed at the point of enactment, is that for 75 years the NLRB had interpreted that interference and coercion language to allow for mixed motive. And this court said in footnote nine of Conscienti, right, it looked to the Ninth Circuit and Bockhelter and said, Bockhelter got it right. And Bockhelter compared this language. What you didn't look at is that the Supreme Court in Transportation Management in 1983, nine years before the FMLA was adopted, said that the mixed motive adoption by the NLRB using this exact language, the Supreme Court nine to zero said that that was a rational interpretation of the NLRA provision. So you have to believe that if Congress knew what it was doing, that it knew not just that the NLRB interpreted that it was patterning language off of the National Labor Relations Act, but that that patterning was deliberate, and they knew not just. But it intended all those other things that you said, which has given them a lot of credit. Can I ask you to focus on the Nassar case for a moment? Sure. Because your clock is ticking down. Yeah, and we will, you exclusively really are going to be dealing with the Rule 403 issue. So we want to make sure you have an opportunity. I think that, and I'm sure Ms. Goldberg will address this in more detail, but specifically with Nassar and Gross, we don't have the deference. You know, the EEOC doesn't have the Schaeffer deference that applies, that's going to apply in this case to the Department of Labor's interpretation of those statutes. When you're talking about what the statute means, this is the language from Nassar, and the usual course the standard requires the plaintiffs show that the harm would not have occurred in the absence of, that is, but for the defendant's conduct ellipses. This is the background against which Congress legislated in an acting timeline. These are the default rules it is presumed to have incorporated. It looks like they're saying unless there is motivating language put in, the default is but for. And I think the problem with that is that transportation management says otherwise. Transportation management says that is the default if you don't have deference to an administrator who can interpret the language. And transportation management went out of its way to say this may not be the way we would have interpreted it as a court in the first instance. But it is a rational interpretation, and we defer to the NLRB. That's exactly what I'm suggesting you have to do here is it may not be the way you interpret it, but we do have Schaeffer indifference in this case. I'll take that up with Ms. Goldberg. The Chief Judge is right. Let's get to the 403 issue, Mr. Salmanson, which seemed to have, as an overarching question, why even if error, this wasn't harmless error. But we can get to that in a few moments. This is an area, by which I mean Rule 403 rulings generally, where this court accords considerable discretion to the trial judge. How was this possibly an abuse of discretion? As well it should, Your Honor, when in fact the balancing test takes place. The difference in this case is that the court actually didn't engage in the discussion. I've been around a long time, and a lot of those were years on the district court, where I read this court's opinion, and district judges were criticized for not doing the balancing, and ultimately the Third Circuit ended up doing it anyway for them. So why should this case be any different? I guess there's two things, Your Honor. Obviously, we could have avoided this whole issue if the court had accepted my proffer as to what would have been the testimony. The standard here, of course, is that the risk of prejudice. Make your proffer here. What would have been the testimony? Sure. Mr. Green would have testified that he had heard a great deal in his words of the conversation, which is the words he used. How does he know it was a great deal if, by his own words, he didn't stop to listen? He was not an eavesdropper, right? Right. He was walking down the hall. He was walking down the hall. Didn't he say he didn't stop to listen? He stopped long enough to hear the conversation, and remember he said that, and I believe he would say the reason I stopped is because Mr. Egan was being very loud. Yes. He did specifically say in his deposition he was being loud, and I don't remember if he used the word aggressive, but he was being loud. So that's what made him stop to hear the conversation. You cannot refute the conclusion of the district court here, no matter how incomplete his 403 analysis was, that what was heard by Mr. Green was a portion of the conversation. That is correct. Let me give you an example of where a portion of the conversation doesn't necessarily mean that there was a risk of confusion. You've actually just answered the question. That's right. When you say it doesn't necessarily mean, he's got the discretion to make that call. That's right. He's the guy in the room. He, in fact, what he did was, without actually listening to the testimony in camera as to what it might be, made a per se rule that because it was incomplete, it was prejudicial. He didn't set forth a per se rule, nor did he say he did. Let me give you this suggestion as well. If I am the trial judge, if I am this district judge, I have watched this trial unfold. Mr. Egan, as the plaintiff, testified, didn't he? Yes. He never testified to this conversation. That's correct. He never testified. That's how big a deal it was. You may know I don't. Did he not recall it? Was it so unimportant that he didn't recall it? What he did is he testified more generally. Very generally. He specifically asked, did he say anything about your health? He said no, because, in fact, in this conversation, he did specifically say, you can't do it because you're disabled. That has to go to the question of whether or not there was a legitimate or a sensible balancing, even if not well articulated by the district court judge. Because if your own client, who was one of the parties to the conversation, wasn't prepared to and, in fact, did not say what happened in that room, why would it have been fair and more probative, instead of being substantially confusing to the jury, to let a stranger to the conversation, who admittedly heard only a snippet of it, come and say something? That was what the district court judge was dealing with. So how can it be an abuse of discretion to say that's not coming in? Well, I guess the other issue is we could have also had Mr. Venuto potentially testify to it, but now it's off limits the way the judge. No, he only precluded Mr. Green from relaying the account of the conversation. There was no ruling concerning whether Mr. Venuto could have provided his account. And, in fact, as my colleagues are saying, the fact that the district court had in front of it that Egan didn't testify about the very conversation and the only other evidence he was starting to hear about was a partial overhear of it, wasn't that within his authority to say this is going to be misleading? Because even a participant here isn't providing any information about it. Let me give you an example of where I think, for example, you can say, look, this would have been an abuse of discretion. If I'm sitting in somebody's office and the phone rings and my colleague, Mr. Goldshaw, picks up the phone and says, no, I don't want to hire that person. He's too old. I've only heard a part of the conversation. I don't know what the person on the other side is. Yes, but that's not this case. Right. But what I'm saying is the fact, standing alone, the fact that the conversation is incomplete does not make it misleading. You want us to read this record as a suggestion, if not, as you said, a per se rule that the district court set forth this rigid or per se rule that a portion gives me the basis for excluding. And I don't read the record to suggest that at all. I think the problem is he basically, the only justification the judge set forth, he didn't say anything about these other issues. Okay, let's jump to that overarching question. Let's assume, Arduendo, that you're correct that there was an abuse of discretion in excluding this evidence. Further assume that you did not get the mixed motive jury instruction. Where's the harmless error here? Where's the harmlessness? Or where's the harm, I should say? We know that the evidence, at least from the district court judge's perspective, he believed that the evidence could have been used by the jury to conclude that Mr. Arduendo had a discriminatory motive. And how do we know that? Because it was one of the very few things he cited in the summary judgment. Sure. He was prepared to say at the summary judgment stage, I'm making a call here that there's something that might come in front of the jury. But it really isn't the case. Is it ever that a judge who says, I'm going to let this go and see how things develop at trial, is really saying, if I thought something might be pertinent at summary judgment, I'm bound by that and can't re-evaluate at trial. I mean, that's where he was. He was in trial. He was in testimony. I'm sorry. You can evaluate the admissibility differently, right? Because now you have the full facts. But I think the specific question from Judge Smith is, does it change the harmfulness? It's not just the admissibility. The risk of harm by non-admitting. And I don't think that changes from summary judgment to trial because the standard is exactly the same. Could a reasonable jury take this as evidence of discriminatory animus? Once you hear something in context and you make a judgment, doesn't that make a difference in whether something, not just on the admissibility front, but on whether or not this is something which could, maybe I'm saying the same thing in other words, that it really couldn't be a harmful error because it's not something which could reasonably be relied on at all. Now, I don't mean to be conflated into two concepts, but it seems to me they're pretty darn closely linked. If you're saying this is not something that could reasonably have been relied on by anybody, doesn't that carry with it a sort of error of harmlessness? I would say a potential for harmlessness, but not an error of harmlessness. And if there's a, if it's only a potential for harmlessness, then that's the jury's province to decide, you know what? Is that, in taking it in the context or taking the snippet that Mr. Green heard, do we think that it was actually evidence of discriminatory animus or was he just frustrated by Mr. Egan's inability to do the job and express a frustration in an inarticulate way? I think we understand your position on that, and of course we will be having you back on rebuttal, Mr. Salmonson. Thank you, and we'll hear from Ms. Goldberg. May it please the Court? My name is Rachel Goldberg. I represent the Secretary of Labor appearing as amicus. Let's start with Nassar. Yes. The Supreme Court said in part causation, in fact, in other words, proof that the defendant's conduct did in fact cause the plaintiff's injury is a standard requirement of any court claim. This includes federal statutory claims of workplace discrimination. What do you make of that language? Well, I don't think it's correct to say that... Doesn't it sound like but-for language to you? It does, but that's not what we have in the FMLA. I mean, Congress frankly didn't even add a prohibition against retaliation for exercising FMLA rights, let alone add or not add mixed motive language. The fact that they didn't even include that basic prohibition is telling. It's a gap that leaves an ambiguity in the statute, and Congress gave us authority. Isn't it the case that the Supreme Court has expressly said the default rule is that it is but-for? That is, when you're looking at language like this, we presume that Congress legislates with that in mind. It's incorporating but-for analysis. Isn't that one of the holdings in Nassar? I think that conclusion flows from the language that the court was looking at in the ADEA and in Title VII. It speaks more broadly than that. It doesn't just say, and in the ADEA and the Title VII context, it speaks about it as a default rule that Congress has in the background as it legislates. I mean, I quoted the language of your colleague. I won't take your time to do it here, but doesn't that mean that the Supreme Court has spoken authoritatively on what the meaning of the language is or how this language is to be interpreted and approached? Well, even if that's true, which I don't necessarily agree with, if you accept that it's a broader holding from that case, it's the default rule, meaning it's not the per se always rule. But what you're saying is that under Chevron, we should defer to what the Department of Labor says, not to what the Supreme Court says. Well, the Supreme Court hasn't said anything about the FMLA. I mean, the FMLA, as I mentioned, contains this very obvious gap, and Congress specifically gave the department authority to issue regulations to carry out the statute. Let me answer this. Yes, I could. When we talk about the Nassar cases, Nassar was looking at the specific statutory language in front of the court at the time. As I understand the Department of Labor's position, the statutory language in front of us in A1 and A2 does not speak of retaliation. And as a result, the regulator wanted to determine whether or not there was a gap in that statutory regulation that required a fill-in. And the fill-in is whether we should allow those who are evoking their FMLA rights and facing an adverse consequence to bring a retaliation claim. Am I correct at that point? Correct, yes. Then is it your position that we need to identify whether A1, A2, or both have such a gap to fill in the retaliation claim, correct? Correct, yes. Then, as I understand it from the DOL final rule, DOL chose to say A1 was the place of ambiguity, Chevron to Step 1, and we decided to fill it in with this regulation. Am I correct? Correct. And then would our analysis of Nassar or Gross focus on the regulation and the causation requirement? Because that's where it's set forth. Am I correct? Correct. Okay, now let me just go back. Why is it that DOL embraced A1 as the basis? Because some of our precedent says the retaliation claim is really one that comes under A2, and Johnson, which is a case we talked about in the prior argument, says retaliation is a form of discrimination. So my question is, I'm sorry it's taking me so many steps to get there, why A1 as the place of ambiguity and, hence, agency authority to gap fill and not A2? Well, the language in A2 is quite specific. It prohibits discrimination, which, yes, that certainly does include retaliation, for opposing a practice that is claimed to be unlawful. I mean, being retaliated against for having taken FMLA leave, you haven't opposed anything. So I think it would be more of an unreasonable construction for the department to have tried to locate it within A2. I know this court has in passing in several decisions cited A2, but, frankly, that was not the focus in those cases, and it didn't matter. And where the court has really analyzed the issue in Conoscenti and subsequent cases, it really identified the regulation itself. Other courts have differed on the source, but the department made clear in the 2008 regulation in which we updated the rule, people had asked us, we had gotten requests, to clarify the source of the prohibition against retaliation for exercising FMLA rights, and we clarified that A1 was the source. We were very clear in our regulation on that, and it makes sense. Interference is a broader prohibition than the acts that are specifically protected and retaliation prohibited against in A2 and B. And it makes sense also because the FMLA creates an entitlement. It gives employees the ability to use this benefit, to take FMLA leave. And it makes sense that the essential functioning of the FMLA depends on not being retaliated against for taking that right, taking that benefit, not having your FMLA rights interfered with. So it logically certainly doesn't fall within the language of A2, and also logically does fall within the language of A1. Well, can I, I hope with my colleagues' indulgence, pursue the Chevron piece of this. Judge Schwartz walked you through how you get to your place in your Chevron analysis. My question to you, I've got a couple. The first is, are you skipping over and saying there's an ambiguity in the statute by ignoring Nassar and saying it doesn't apply? In other words, if the Supreme Court says this is the presumption that's to be made when Congress uses this kind of language, have they or have they not definitively said how that language is to be read, and therefore there isn't an ambiguity about whether that language means but for causation or not? In short, aren't you asking us to blow past the Supreme Court language in Nassar to get into Chevron deference when there's really not an ambiguity? Well, two things. One, the Supreme Court itself in Gross, which is of course the precursor to Nassar, distinguished National Transportation, NLRB versus National Transportation Management on the very basis that the agency in the first instance had interpreted the statutory language prohibiting interference. But if Judge Jordan is correct in the predicate to his question, there's no gap to fill, right? Well, if that's true. If Nassar provides the default, there's no gap to fill, and therefore no reason to proceed with Chevron deference analysis, correct? But if that were true, where would you even look to determine whether a mixed motive is prohibited because retaliation itself isn't even prohibited, frankly? I mean, retaliation for exercising your FMLA rights is not within the FMLA statute. Well, I don't think you're coming to grips with what I'm trying to ask, which is whether Congress had left an ambiguity in there is the starting point for a Chevron analysis. Now, you can disagree, and you clearly do, that the Nassar language sweeps as broadly as my question suggests it does. But if you assume for the sake of discussion that Nassar makes a statement that this is a default rule against which legislation Congress passes will be measured, that we presume Congress means this when it uses language, unless it specifies otherwise, doesn't that stop Chevron before you get to Step 1? Or you could say not before, but at Step 1, because there's no ambiguity. We're not at Step 0. We're at Step 1, but it's not ambiguous. Between the two of us, this is the third time that question's been asked. I guess the reason I'm having trouble understanding it is because what's not ambiguous? What's the language that you're looking to that is supposedly not ambiguous? The FMLA language that you say is ambiguous. But if I could just see if I can help here. If I understand the DOL's position, your position is it's ambiguous because it doesn't speak to retaliation. I think Judge Jordan's question is it's not ambiguous insofar as it talks about what the causation needs to be proven. Judge Jordan, am I understanding? Yeah. Okay. But that's causation as to the types of retaliation prohibited in A2 and B, which is clearly a different type of retaliation. No. We are talking past each other. Maybe this isn't fruitful, but the idea that I'm trying to put to you is if one accepts that NASA speaks broadly, it isn't targeted at ADEA. It's not targeted at Title VII. It's not targeted at FMLA A1 to EIEIO. It's speaking broadly and across the board. When we look at the language, if Congress wants to put mixed-mode stuff in, it'll put it in. It'll say it. And if it doesn't, we're going to presume and you're to presume that Congress needs but-for causation as an all-court claim. So ignoring the doesn't prohibit retaliation, we're just going to basically apply that but-for causation to all statutes unless it contains Title VII mixed-mode of type language, I think is what you're saying. Is that correct? I'm asking if you take that as predicate. I think there are a couple reasons why that's not necessarily correct. The transportation management but also the courts. This court, well, the D.C. Circuit in Ford looked at the statutory language in the federal section of the ADA. It doesn't contain mixed-mode of language but read it as distinct from the language that was analyzed in Gross. This court in Brown looked at Section 1981.  I know Your Honor concurred and said we needed to look at this issue more indepthly and now we're doing that. But nonetheless, the court did say that Gross didn't apply. It doesn't matter that we don't have mixed-mode of language. The fact of the matter is we don't have the but-for because language that requires a but-for causation. I'd like to just take sort of what Judge Stewart is asking but just put it at step two of Chevron for a second. Let's assume that the statute from your point of view is ambiguous as to whether it provides a cause of action for retaliation. Therefore, you go to Chevron step two. Step two says look at the regulation and is it within bounds for the agency, is it reasonable, et cetera. Perhaps one question I would have is mindful of Nassar. Could the regulation be found unreasonable because the Supreme Court talks about but-for causation? Would that be something that would put the regulation at risk? Well, I mean, certainly not the part of the regulation that prohibits retaliation. No, just the cause of connection, which is what I think Judge Stewart. Mixed-mode of language. I mean, I guess in theory it could, but I don't think that's necessarily required by Nassar. So at that point, if we get to step two, then your argument is that it would be reasonable for the Department of Labor to take a position contrary to, again, this is reading Nassar the way I'm positing. It would be reasonable for the Department of Labor to promulgate a regulation that flies in the face of the Supreme Court's assertion that it is to be but-for litigation. It is to be, excuse me, but-for causation in the absence of clear language to the contrary. In the regulation. Well, in our defense, we did promulgate this regulation before Gross. Yeah, now we're into our deference, and we can get into that in a minute if you want. Right. The court could say that, but I think if you're in Chevron step two, the analysis is was our interpretation reasonable? If you're already in Chevron step two and it's an ambiguous statutory language and Congress clearly delegated legislative rulemaking authority to the Department and we issued a notice and comment regulation, the calculus, the analysis that the court should go through at that point isn't exactly Nassar. It isn't exactly what the court would determine. Well, no, that is the question that Judge Schwartz, I think, is putting to you, and it's the one I was going to put to you, so we're on the same wavelength. If you get to step two, isn't the standard for step two whether the interpretation given to the statutory language is reasonable? And how can it be reasonable if it's contrary to a definitive statement by the U.S. Supreme Court? To get it to be reasonable in the face of that, don't you have to say, well, we're the Department of Labor, so what we say goes? It's like Chevron on steroids, right? No, I think it's odd to apply Nassar to Chevron step two. I understand what you're getting at, but the court did take pains to distinguish national transportation. I'm trying to tease out a discussion here. The court in Gross did take pains, well, I don't know if it took pains, but it noted in a footnote that NLRB versus Transportation Management was different, and that its ruling didn't invalidate that case and that case didn't compel its ruling in Gross. It distinguished it precisely because it had previously deferred to it, and I know this is a later statute, but it still recognized the role of an agency in interpreting its own statute when there is an ambiguity, and that's precisely what we have done. Well, your real argument, it sounds like, is Nassar doesn't, you're taking issue with the premise, Nassar doesn't sweep that broadly. I think that goes back to my original back and forth with Your Honor. I don't think Nassar sweeps that broadly. I think Nassar says, look at the language. Does it permit mixed motive? Does it preclude mixed motive? And here, the statutory language, interference, neither precludes nor permits. It's indifferent, and the department has reasonably filled that gap.  Thank you. And we'll hear from Mr. Davis. I can still say good morning. Good morning, Your Honors, and may it please the Court. My name is Zach Davis. I'm counsel for the appellee in this instance, the Delaware River Port Authority. With the Court's indulgence, I'd actually like to start with where we perceive sort of the analysis of the type of claim Mr. Egan has brought, where that analysis would end. And it's an issue that neither Mr. Egan nor the Department of Labor has squarely addressed. And that is to say that even if there is a mixed motive instruction, that the mixed motive instruction exists for the type of claim Mr. Egan has brought, and even if you can overcome the need for direct evidence or show that direct evidence is no longer required. This Court, in fact, Your Honor, Judge Jordan wrote the opinion in Connolly v. Lane Construction, which actually is just a year ago yesterday. And there you held that even in a world where a mixed motive instruction exists, and that was a Title VII case, a plaintiff must at the very least allege both legitimate and illegitimate motives for an employer's action before a mixed motive instruction may be given. Mr. Egan simply has not brought a mixed motive claim here. He's pursued throughout this case that this was a matter of effectively direct discrimination against him, right? Respectfully, Chief Judge Smith, his focus and Mr. Salinson's focus advocating on behalf of Mr. Egan throughout this case has been a focus on pretext and a focus on proving that the deal is effective. That's effectively what I meant. I mean, he's maintained throughout that the reason that the authority advanced isn't their real reason. That happened from first to last. Absolutely. If that's your position, though, why did you both do joint jury instructions that provided the Court with both the pretext theory and the mixed motive theory? If your position was it was always a pretext case. In conversations with Mr. Salinson in trying to interpret Judge Savage's instructions, we perceived that what he asked us to do was submit different jury instructions to be resolved later at the jury conference. We never conceded that the mixed motive jury instruction was appropriate at any time, much as Mr. Salinson, I think, would say he did not concede that the pretext instruction was appropriate. But the way we reviewed the instructions, that was how we chose to proceed. Mr. Egan literally never at any time in this case has conceded any legitimacy to any of the DRPA's justifications for what it did to him. And just to quote a little bit from Mr. Salinson's opening statement, when he described Mr. Egan's claims to the jury, he looked at the jury and he said, our focus in this trial will be comparing the evidentiary record, the authorities' own documents, and the credible testimony of witnesses against the authorities' explanations for its actions. He said, we believe you will agree with us that those explanations simply don't add up and that they are a cover-up for the authorities' true discriminatory motives. All right. So obviously we'll be hearing from Mr. Salinson on rebuttal, but I presume he's going to get up here and say something to the effect of the mere fact that we suggest that indeed there is a pretext doesn't take off the table the possibility that there's a mixed motive. There's stuff in the record that would support that. And assume we get past this part of your argument. Join issue, would you, with the Department of Labor on whether, and you can get to whether it's A1 or A2. I know that's a subject of a lot of your briefing. But on this question of whether or not Nassar is applicable, did you make that kind of an argument at any point? I mean, is this just us kicking stuff around with the Department of Labor in a way that's academic because it's not really an issue in this case? I think it very much is an issue in this case. So where did you make that argument? Where did you make an argument that Nassar sets a default rule and so Chevron really, you don't get past step one. Or if you do get past step one, at step two it's an unreasonable interpretation of the statute. I believe we made that argument in our briefing, Your Honor. Yeah, and I'm trying to ask you where. What would I look at in your briefing to say that's what they're getting at? One moment. I mean, we had an entire section of our brief devoted to Chevron deference and the impact of Nassar and Gross on whether Chevron deference is appropriate. And I apologize, Your Honor, that I'm not able to cite chapter and verse at the moment. All right. But you think you framed up the argument reasonably closely to the arguments that were put to Ms. Goldberg today? I do, Your Honor. I do. Nassar and Gross, as both Your Honor and Chief Judge Smith highlighted with Ms. Goldberg, Nassar and Gross remove any ambiguity from a statute in terms of what the evidentiary burden would be or whether the burden of proof can shift to a defendant in an employment case. Well, I understood the argument right. Ms. Goldberg was saying, in essence, the ambiguity is about the retaliation. It's not about but for cause. That's what they were gap-filling on. And the gap-filling then involves a discussion of causation, whether it comes up in A1 or A2, right? Did Nassar speak at all to retaliation? Didn't say anything about that, right? Correct. Nassar did not. Well, Nassar spoke to retaliation under Title VII. What I mean is the causation stuff is not the money language there for this line of argument, is it? I think that's correct, Your Honor, in my recollection of the way the justices framed the argument in that case. But Nassar is still quite clear that but for causation is the default rule, absent explicit statutory language as dictated by Congress. So under that theory, are you saying that the problem with this regulation isn't that there was a regulation that allowed retaliation but that the causal connection, whether it's a negative factor or not, is the problem? Quite correct, Your Honor. The existence of the type of retaliation claim that Mr. Egan brought has been clarified by the Department of Labor in the regulation as part of the Department of Labor's natural role in, I think Ms. Goldberg used the phrase gap-filling or filling in that gap. So why aren't we under, because if there is an ambiguity, and the ambiguity was does retaliation exist as a cause of action, got gap-filled, we go to Chevron Step 2, we have such a high level of deference to the regulator, why isn't it something we have to give respect to that the regulator decided because FMLA rights should be protected, that if retaliation was one of the reasons why the person faced an adverse employment action, that should be sufficient for relief. Why is that problematic? With respect to, Your Honor, I'm not sure that we would argue that there is ambiguity in the FMLA with respect to the existence of the retaliation claim. If there is not, then we're back to what Judge Jordan was saying, we're in Chevron Step 1. Where is retaliation a cause of action permitted under the language of A1 or A2? Retaliation is included within the discrimination ban of A2, which the court in Nassau actually discussed in a different context about how it's permissible to read an intent to ban retaliation into a broad anti-discrimination statute. And we can quarrel about how broad the language of the FMLA is, but it's certainly appropriate to read a ban on the type of retaliation Mr. Egan alleged into the statute, because as the Department of Labor and numerous courts have stated to date, if the type of retaliation Mr. Egan seeks to bring in this case is not banned, it essentially thwarts the entire purpose of the FMLA. How about this on timing? And presuming that Congress knows things and doesn't know things. I mean, we are talking a lot about presuming what Congress knows or doesn't know, but I believe the Department of Labor has made the point in its papers that Congress has amended the FMLA three times since these regulations came out and has never done anything, never made a peep about it. And we should presume that Congress knows the regulatory background against which it's legislating. So Congress has accepted this interpretation, and so should we. Where's the error in that line of reasoning? The error in that line of reasoning, Your Honor, is that the idea as to what Congress knew or what Congress is aware of cuts both ways in this case, I would argue, in equal measure. In that, as you pointed out in your questioning of my colleagues, that Congress was also aware of the Price Waterhouse decision, Congress was also aware that it itself amended Title VII in response to Price Waterhouse in 1991, specifically to include the motivating factor language, specifically to include it because it recognized that it needed that language in order to have a motivating factor analysis, and in particular, a burden shift with respect to Title VII discrimination claims. And it's telling how nuanced that approach was for Congress, because as the Supreme Court has subsequently held, it only made that amendment with respect to discrimination claims and not retaliation claims under Title VII. So Congress's awareness of the need to include the text of Title VII. You could say that's nuanced, or you could say that that's Congress just, you know. Being Congress? Congress being Congress? Yeah. What about the, and this is more on the, they know about the background. The last time they amended it, it was after Gross, I think maybe before Nassar, but after Gross. So they were aware of, if you assume they know about Supreme Court language and interpretation too, they knew this dispute was out there about but-for causation and should that, et cetera, et cetera, and yet still they knew nothing about this regulation. Is that meaningful? It's meaningful, but subject to dual interpretations. So you could just as easily argue that it was aware, Congress was aware that Gross had dictated that but-for causation is the norm, and by failing to add motivating factor language to the statute, Congress was aware that it was subjecting these type of claims to the but-for or determinative factor analysis because it failed to amend it. I mean, Congress's failure to amend could be indicative of either one. I don't think it supports the idea that it's, that failing to amend the statute is a natural deference by Congress to that language of the Department of Labor regulation. On the subject of Chevron deference, I'd just like to add that the Supreme Court in Gross specifically identifies in a footnote that the evidentiary standard in terms of what analysis to apply to these types of claims is for Congress to make. That's in footnote three of the Gross opinion. Apropos of assume that there is a permission to give a mixed motive instruction, the retaliation regulation is upheld, et cetera, Desert Palace makes the point you just made. That says, you know, we presume that the normal rules of proof are at play unless Congress says otherwise. So would you agree that in light of Desert Palace, there is no longer a need for direct evidence? Not with respect to FMLA retaliation, Your Honor. And the answer to that is because Desert Palace was very specifically focused on Title VII and the way that it was amended by Congress in 1991. And the court in Desert Palace specifically said that, or excuse me, the court in Gross specifically said that courts should not look to apply the rules applicable to one statute to a different statute without a careful and critical examination. They actually used that language so as not to apply Price Waterhouse and Desert Palace to claims under the ADEA. Yeah, but the ADEA was amended contemporaneously with the Title VII amendment, right? That's a different kind of a thing. It's interesting because it appears that you're suggesting to us, don't pay any attention to congressional inaction when it comes to saying, oh, the FMLA's been amended three times since the DOL promulgated its rule. But you are saying, oh, pay attention to the fact that Congress did not do something with respect to amending the FMLA when it was doing things with respect to other statutes. Should we read or should we not read a congressional inaction to mean something? And if we do read it to mean something, should we be consistent in the way we read it to mean something? Well, the focus, Your Honor, is more on congressional action than congressional inaction, which is to say the inaction of the FMLA two years after the amendments of Title VII is really the most significant action or inaction taken by Congress with respect to trying to infer congressional intent as to what the burden of proof or what the motivating factor or determinative factor analysis should be with respect to these types of claims. I mean, the only language that Congress put in the FMLA that would indicate what it thought the burden should be is the four opposing language that you cited earlier. And four opposing, though not a verbatim copy of the because of language of the ADA and the ADEA, is clearly an expression of the same concept and the same congressional intent. I'm sorry, but I just need you to work with me. I don't mean to be obtuse. But I thought your argument was that, look, Congress expressly amended the Civil Rights Act in 1991 to add a mixed mode of instruction. And so when they didn't do that a couple years later in the FMLA, it was because they didn't mean for it to be in there. They knew how to put it in, but they didn't mean for it to be in there. Is that the argument? Excuse me, yes, Your Honor. Okay. Your time is just about up, and I would like to hear from you on the 403 issue. Yes, Your Honor. Mr. Davis, this was a conversation overheard, but apparently with a loud voice, and a statement, if I recall correctly, to the effect more explicitly, what can you do, Joe, given the setting that we're talking about? Isn't that a pretty – there's no question of relevancy here, is there? So isn't that a pretty powerful, potentially powerful piece of evidence that could have changed the game? Respectfully, Your Honor, it is not. And it is not because, as you pointed out earlier in questioning Mr. Salmonson, first of all, at the time that this evidentiary ruling was made, Mr. Egan has already testified at length. And not only has he not referenced the specific conversation that Mr. Green was supposedly going to testify about, but Mr. Egan had already specifically testified that Mr. Venuto had never implied he was unhappy with Mr. Egan's use of FMLA leave, and that Mr. Venuto had never made any negative comments about Mr. Egan's disability status. Mr. Egan actually testified that nobody at the DRPA had ever said anything negative to him about his disability. And prior to the evidentiary ruling, Mr. Green himself, just prior to the evidentiary ruling, testified that he could not recall observing any DRPA managers, of which Mr. Venuto was one, any DRPA managers discussing Mr. Egan's health with him. So that's the backdrop against which the court decided not to admit the testimony of someone who was not in the conversation, never stopped walking, and could not testify as to exactly how much of the conversation he had observed. And I think it's also important to remember that excluding this evidence did not prevent Mr. Egan from introducing evidence of the conversation from either of its participants, if the conversation had taken place, but he chose not to do so. Mr. Salvinson was incorrect in standing up here earlier, saying that Judge Savage's ruling had foreclosed any testimony about the conversation at all. Mr. Venuto testified twice. He testified as part of both parties' case-in-chief. And he was never asked about this conversation. He was never given the opportunity to testify to it by Mr. Salvinson or any of the other counsel for Mr. Egan. So excluding that testimony was proper, particularly given the high standard of review that this court must apply to that decision. As you pointed out, it's an abuse of discretion. It has to be clear error. It has to be arbitrary or irrational. Well, beyond that, this court has said, if there is ever a case where deference to a trial judge is due, it is in the 403 setting. If I may, in terms of weighing the probative value of the testimony against its prejudicial impact, this court in Coleman v. Home Depot specifically found that evidence had low probative value when it was explicitly contradicted by earlier testimony. And this testimony, the proposed testimony from Mr. Green, would have been explicitly contradicted by multiple witnesses who had already testified at trial. So there was really no error committed by Judge Savage in excluding it. And as Your Honors hit on earlier, if I may, we would just add that any error, as we stated in our brief, to the extent there was any error here, it was clearly harmless, highly probable that the error would not have contributed to the judgment because of the otherwise total lack of evidence Mr. Egan had in support of his claims. Thank you, Mr. Davis. Thank you. Mr. Salvinson, you have rebuttal. Very briefly, Your Honors. This court has already said that it believed that the Ninth Circuit was correct in its analysis of why this kind of retaliation is unlawful under the statute and said it derives from A1. It relied on Bob Felder. Can I get you to square up to something Mr. Davis said? Right at the outset he said this case was never presented as a mixed motive case. There's no basis for a mixed motive instruction because they only presented a pretext case. That was it from start to finish. What's the response? So there's two responses. First of all, the law has always been that the plaintiff doesn't need to make the election until the close of evidence. So until the close of evidence, we didn't have to say whether we were going on a mixed motive or a direct evidence case. And, in fact, we asked for the potential for the mixed motive instruction because we knew that there was the potential that we would be asking for it at the end if we were only proceeding. We wouldn't be sitting here right now arguing about the liability of a mixed motive instruction. So what foundation? Tell us something in the record. What's the foundation for a mixed motive instruction? Because I take your opponent's argument to be he was quoting from the opening statement, and you're saying, yeah, we could have waited until the end. But at the end, by the end, what did you have that would allow you to get that? So I think Your Honor is implying that you need direct evidence for a mixed motive case. No, I'm not. No, I'm not. I'm not implying that at all. Okay. Then let me step back. The courts, in light of Desert Palace, is very clear that you should not be cabining the type of evidence. In other words, pretext is one way of showing that there is a motive or a but-for motive. The idea of pretext versus direct evidence are just two methods of showing that a discriminatory motive motivated an employer in whole or in part. Why isn't the answer here that instructions to a jury are the means by which trial courts present the jury with the applicable legal rules they are to apply and to help the jury in how they're going to go about applying those rules. And those instructions are given at the end, as you said a little bit ago, of the production of all the evidence. At that point, the evidence in this case, not merely your evidence, but the entire record, was a record from which a jury could find mixed motives existed, if a mixed motive regime is appropriate. Not perhaps by virtue of your evidence, but by virtue of the presentation of evidence and the counter evidence. You present throughout that this was pretext, start to finish. The defendant says there's nothing pretext about this. This is a case of a man who simply was not conducting himself appropriately with respect to attendance and otherwise. It's actually a little different. What they argued was he was laid off because of this economic development. Well, sure. So you could conclude from that that either his disability and his use of FMLA was a motivating factor or a but-for factor. In any event, the man's not an engineer. He's put in the engineering department. You've got a record suggestive of several courses of action. So all I was asking you is why isn't the answer, at the end of the day, you had a trial record before a jury, from which they could have decided there were a number of things going on. That's exactly right. And I think just to bring this point home, Judge Easterbrook, after we briefed this case in the Seventh Circuit, in a case called Ortiz v. Warner Enterprises, 834F3rd, 760, said that courts need to stop separating direct from indirect evidence and proceeding as if they were subjected to different legal standards. All evidence belongs in a single pile and must be evaluated as a whole. And I think he's saying exactly what you're saying, Judge Smith, is you take all of that evidence as a whole, and at the end of the day, the jury, if you're entitled to a mixed motive instruction, the jury is first asked, do you believe that his use of FMLA was a motivating factor? The answer to that is yes. Then you go on to say, and do you believe that the defendant met its burden of proof that they would have taken the same action in any event? That's what the mixed motive is all about. The evidence certainly as a whole in this trial presents that. I do want to make one last point. We're up. We've given you a lot more than your two minutes, Mr. Simanson. So that will conclude this argument. We thank both sides for their very helpful argument. We'll take the case under advisement. We'll ask the clerk to please adjourn and proceed.